# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

|  |  |  |
|---|---|---|
| SOO LINE RAILROAD COMPANY, d/b/a/ CANADIAN PACIFIC, a Minnesota corporation, | ) ) ) ) | Case No.: |
| Plaintiff, | ) ) | Judge: |
| vs. | ) ) | Mag. Judge: |
| CONSOLIDATED RAIL CORPORATION, a Pennsylvania corporation; | ) ) ) ) | |
| NORFOLK SOUTHERN RAILWAY COMPANY; a Virginia corporation; | ) ) ) ) | |
| CSX TRANSPORTATION, INC., a Florida corporation; and | ) ) ) | |
| the INDIANA HARBOR BELT RAILROAD COMPANY, an Indiana corporation; | ) ) ) ) | |
| Defendants, | ) ) | |

## VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Soo Line Railroad Company, d/b/a Canadian Pacific ("CP") states and alleges as follows:

## THE PARTIES

1.      CP is a Minnesota corporation with its principal place of business located in Minneapolis, Minnesota.

2.      Defendant Consolidated Rail Corporation ("Conrail") is a Pennsylvania corporation with its principal place of business located in Philadelphia, Pennsylvania.

3.     Defendant Norfolk Southern Railway Company ("NS") is a Virginia corporation with its principal place of business located in Norfolk, Virginia.

4.     Defendant CSX Transportation, Inc. ("CSX") is a Florida corporation with its principal place of business located in Jacksonville, Florida.

5.     Defendant Indiana Harbor Belt Railroad Company ("IHB") is an Indiana corporation with its principal place of business located in Hammond, Indiana.

6.     IHB is jointly owned by CP and Conrail, and it operates on property owned by Conrail, CSX, and NS in Lake County, Indiana and Cook County, Illinois ("Rail Properties").

7.     Through an agreement entered into by Conrail's predecessor and IHB on April 9, 1906 ("1906 Agreement"), Conrail's predecessors granted IHB rights to occupy and operate over the Rail Properties.  The original 1906 Agreement was to last for ninety-nine (99) years.

8.     CP and Conrail are the sole shareholders of IHB.  Conrail currently owns fifty-one percent (51%) of the stock in IHB, and is thus the controlling majority shareholder.  CP currently owns forty-nine percent (49%) of the stock in IHB, and is thus the minority shareholder.  IHB's shares are not traded in any securities market.  CSX and NS own 100% of the equity interests in Conrail, and thus control Conrail (Conrail, CSX, and NS are hereinafter collectively referred to as the "Majority Owners/Landlords").

9.     Pursuant to a 1999 agreement ("1999 Agreement") approved by the Surface Transportation Board ("STB"), CSX and NS possess an equal right to direct the exercise of Conrail's ownership rights regarding IHB and to select an equal number of IHB directors to be appointed by Conrail.

10.    At all relevant times herein, John Hart and Mike Pendergrass are IHB's CSX-appointed directors, and Terry Evans and Tom Werner are IHB's NS-appointed directors

2

(collectively, the "Majority Directors").

11.     At all relevant times herein, Steven Nettleton, Tom Albanese, and James Clements are the remaining IHB directors, and are employed by CP or its affiliates and appointed to the IHB Board by CP (collectively, the "Minority Directors").

12.     Pursuant to the 1999 Agreement, which remains in effect until 2024, the Majority Directors vote as a block on matters relating to IHB. The 1999 Agreement also requires NS and CSX to cause Conrail to replace the 1906 Agreement with an agreement on the "same basis and for a term of years equal to" the 1906 Agreement.

13.     NS and CSX thus exercise control over Conrail by virtue of their ownership of Conrail, and over IHB by virtue of Conrail's majority interest in IHB, Conrail's majority position on the IHB Board, and the 1999 Agreement directing NS and CSX to vote together as a block on matters relating to IHB.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and it is between citizens of different states.

15.     This Court has both personal and subject matter jurisdiction over the parties and matters herein.

16.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to CP's claims occurred in this district, and a substantial part of the property that is the subject of this dispute is located in this district.

## BACKGROUND

17.     IHB is a switch carrier which operates generally within the Chicago area. The

3

Chicago rail corridor is one of the busiest rail hubs in the world.  IHB functions to ensure that the many railroads which move through Chicago can do so efficiently via the IHB, which then connects with multiple other carriers.

18.     Pursuant to the 1906 Agreement, IHB paid Conrail an annual depreciation-adjusted rent of approximately $150,000 to operate over the Rail Properties, which was calculated to achieve a five percent (5%) return on investment, based on agreed-upon property valuations and the parties' proportional use of the assets.

19.     Upon information and belief, Conrail paid $1 to $2 million per year to IHB to account for its proportional responsibility for certain operating and maintenance expenses associated with the Rail Properties ("O&M Expenses").

20.     The obligations of Conrail and IHB set forth in the 1906 Agreement, including IHB's annual rental payments to Conrail, remained largely unchanged until 1999.

21.     In 1999, the Majority Owners/Landlords stopped invoicing the IHB for rent under the 1906 Agreement, so the IHB did not have any rental payments to make, and Conrail stopped paying O&M Expenses to the IHB.  Upon information and belief, Conrail and IHB management entered into a quid pro quo agreement in 1999 without the consent of the IHB Board to allow Conrail to avoid its obligation under the 1906 Agreement to pay certain O&M Expenses, which totaled approximately $2.3 million in 1998.

**THE 2011 TERM SHEET**

22.     On or around November 16, 2011, Conrail presented IHB's former General Manager Jim Roots with a term sheet for a proposed "lease" between IHB and the Majority Owners/Landlords ("2011 Term Sheet").  The 2011 Term Sheet would have required IHB to pay an annual base rental rate of $5,500,000, payable in monthly installments of $453,333.33, with

4

annual adjustments to be made based on the Consumer Price Index.

23.     The proposed rental payments under the 2011 Term Sheet constituted an increase of approximately 3,566% from the rent paid by IHB under the 1906 Agreement.

24.     Even though the 2011 Term Sheet covered increased rent demands for three separate parcels, each owned separately by the different Majority Owners/Landlords, upon information and belief the methodologies for calculating rent on each parcel were the same, indicating that the Majority Owners/Landlords colluded in establishing those rates to the detriment of IHB and CP.

25.     At the IHB Board's direction, and after formal review of the 2011 Term Sheet, IHB management presented a white paper to the IHB Board on March 2, 2012 (the "White Paper"), expressing IHB management's numerous concerns with the proposed agreement.

26.     IHB management's concerns with the 2011 Term Sheet included, without limitation:  (1) it was akin to a ground lease and did not cover all of the operating issues inherent to the IHB contained within the 1906 Agreement; (2) it proposed an initial five-year term with renewal options as opposed to a long-term arrangement; (3) upon termination of the lease, IHB would be required to make filings with the STB to vacate the premises; and (4) IHB would surrender millions of dollars in improvements IHB made to the Rail Properties to Conrail even though the 1906 Agreement treated those improvements as IHB property.

27.     The White Paper also rejected the rental rates proposed in the 2011 Term Sheet, which were based on an inaccurate appraisal of assets prepared by RMI Midwest ("RMI Appraisal") for Conrail.  The annual rent contemplated by the 2011 Term Sheet was equal to 10% of the property's inflated appraised value under the RMI Appraisal.  A 10% annual rate of return is grossly inconsistent with the railroad industry standard shortline lease rates, and

5

problematic in light of the short five-year term contemplated by the 2011 Term Sheet.

28.    The RMI Appraisal is biased toward Conrail, which procured it, and contains numerous errors. The RMI Appraisal is erroneous because, without limitation:  (1) it based its valuations upon the highest and best commercial use of the land in urban Chicago; (2) it failed to account for the considerable regulatory constraints that would prevent conversion of the Rail Properties from railroad use to conventional commercial use; (3) it added a 60% premium for a "corridor enhancement factor;" and (4) it included approximately $35 million in assets such as rail and other improvements for which IHB, not Conrail, had invested *entirely on its own.*

29.    IHB management determined that the massive cost increase proposed within the 2011 Term Sheet posed a serious threat to IHB's financial viability, and could render IHB insolvent, thus jeopardizing not only IHB, but efficient rail traffic through Chicago in general.

30.    In mid-April of 2012, Conrail responded to the White Paper with a new proposed memorandum of understanding ("MOU").  The MOU not only ignored IHB management's concerns expressed in the White Paper, it proposed conditions that were even more onerous than those set forth in the 2011 Term Sheet with respect to, among other things, rental rate, duration, valuation of land, acreage, credit for IHB improvements, and operating terms.

## THE 2015 PROPOSED MASTER TRACKAGE RIGHTS AGREEMENT

31.    Discussions over the proposed lease and the 2011 Term Sheet stalled thereafter.

32.    At the December 2014 IHB Board meeting, CP-appointed director James Clements suggested that the Board find a use for the company's excess cash reserves; for example, by distributing those reserves as dividends to the company's two shareholders, CP and Conrail.  Mr. Clements raised the matter of IHB's excess cash reserves again at the March 2015 Board meeting.

CORE/9990000.7432/132007919.1

33.     Shortly thereafter, the Majority Owners/Landlords proposed a new master trackage rights agreement (the "Proposed Master Trackage Rights Agreement") to IHB that again included conditions more onerous than those set forth in the 2011 Term Sheet.

34.     For example, under the new Proposed Master Trackage Rights Agreement, IHB would initially owe annual rent of $7.4 million to Conrail, increasing to $8 million by 2020.

35.     Upon information and belief, the Majority Owners/Landlords created the Proposed Master Trackage Rights Agreement in concert with each other, including the exorbitant rental rates contained therein, even though each Majority Owner/Landlord is a legally distinct entity and separately owns the individual parcels on which the IHB operates.

36.     The purpose and effect of the Majority Owners/Landlords' exorbitant rental rates contained in the Proposed Master Trackage Rights Agreement require IHB to divert its accumulated excess cash reserves to make annual rental payments to Conrail, rather than distribute those reserves in the form of dividends to all of its shareholders.

37.     Such a shift would deprive CP of its rights to dividends as a 49% owner of IHB.

38.     At a March 3, 2016 board meeting, IHB management declared that the terms in the Proposed Master Trackage Rights Agreement were not in IHB's best interest because, in part, IHB's ending cash position by 2020 would be negative $5.9 million.  This contrasted sharply with IHB's substantial positive ending cash balances projected in IHB's base plan at that time.

39.     After the March 3, 2016 IHB Board meeting, the CP-appointed Minority Directors complained that they had not previously been given information relating to the negotiations over the Proposed Master Trackage Rights Agreement.

40.     In particular, these Board members were not provided with the appraisals apparently prepared by RMI Midwest for CSX and NS which were being utilized by those two

7

companies in connection with the negotiations, nor were they provided with an alleged $3.3 million "agreement" that was referenced during the Board meeting and which was supposedly signed by a former IHB General Manager.

41.     By letter dated March 16, 2016, CP objected to and delineated its position on the Proposed Master Trackage Rights Agreement, noting that it was unacceptable for many of the same reasons that IHB management's White Paper rejected the 2011 Term Sheet.  Among other concerns, CP noted the following:

   a. The financial terms were still apparently based on the RMI Appraisal, which remained flawed for the reasons originally noted in the White Paper;

   b. The rental rate calculation continued to confiscate and include the value of approximately $35 million in capital improvements funded entirely by IHB;

   c. The structure of the proposed agreement, which continued to be in a lease format, was not a sufficient replacement to the 1906 Agreement; and

   d. The agreement included property that IHB did not use, need, or want.

42.     CP further notified Conrail that, from CP's perspective, the actions being contemplated by Conrail and IHB's Conrail-appointed majority directors appeared to be little more than a thinly veiled attempt to divert cash—which would otherwise be available for distribution to IHB's shareholders—solely to Conrail (for the ultimate benefit of NS and CSX).

43.     CP pointed out that these actions were jeopardizing IHB's financial future and causing CP, as the minority IHB shareholder, direct harm because it would bear the impact of substantially all cost increases while Conrail—and CSX and NS indirectly—would receive all of the benefit.

CORE/9990000.7432/132007919.1

## THE IHB MANAGEMENT RECOMMENDATION

44.     On June 2, 2016, the IHB Board passed a resolution directing IHB management to provide CP and the Majority Owners/Landlords all information necessary to determine the appropriate properties to be subject to an agreement, and to retain outside counsel and consultants (including an appraiser) to assist in evaluating and negotiating the terms of any new agreement.

45.     In September 2016, IHB management received independent market value estimates for the Rail Properties from Kenneth Young & Associates, and a return on investment analysis by AECOM recommending a 2.74% rental rate for the properties under consideration.

46.     In September and October of 2016, IHB management offered proposals for a new agreement ("IHB Management Recommendation") to the Majority Owners/Landlords, based on the Kenneth Young & Associates and AECOM analyses.

47.     The IHB Management Recommendation contemplated annual rental payments of $362,285 to Conrail, $642,700 to NS, and $341,714 to CSX.

48.     The IHB Management Recommendation is the product of thorough, independent analysis and consultation by IHB management, which owes fiduciary obligations to IHB and all of its constituent shareholders.  In addition to being based on neutral appraisals and analyses by Kenneth Young & Associates and AECOM, the IHB Management Recommendation excludes from its valuation corridor enhancements as well as those substantial leasehold improvements that were paid for and are owned by IHB.

49.     Shortly after the IHB Management Recommendation was provided, Conrail demanded that IHB make changes to the recommendation's proposed rental rate.

50.     In a letter dated November 14, 2016, Conrail notified CP that it had reached a

separate agreement with IHB management that included modifications to the Conrail rental amounts provided in the IHB Management Recommendation.

51.     CP responded, stating that the IHB Management Recommendation was fair and reasonable, that it was unaware of any agreement to pay rental amounts other than those included in the recommendation, and that the Majority Directors had a fiduciary duty to act in the best interests of IHB and its minority shareholder CP.  In the event the Majority Directors were to seek more compensation or refuse the IHB Management Recommendation, CP stated that additional scrutiny would be required to ensure they were not acting out of self-interest.

52.     CP also took issue with Conrail's demand that IHB pay nearly $2.6 million in accrued rent since 1999, even though the Majority Owners/Landlords had not paid approximately $20 million in operating expenses to IHB that accrued since that same time.

53.     IHB's General Manager, Pat Daly, presented the IHB Management Recommendation at the December 7, 2016 board meeting.

54.     Mr. Daly announced that IHB management rejected the Majority Owners/Landlords' latest proposal to have IHB pay $5.6 million in annual rent, and IHB management continued to recommend that IHB agree to the terms of the IHB Management Recommendation.

55.     The CP-appointed Minority Directors then proposed a resolution to adopt the IHB Management Recommendation.  The motion to adopt the resolution failed, with the Majority Directors, acting as agents of the Majority Owners/Landlords, voting against it.

56.     After additional discussion, NS-appointed director Mr. Werner, acting as agent of NS, moved to adopt a slightly modified version of the IHB Management Recommendation. Specifically, Mr. Werner proposed that the resolution originally introduced by the Minority

10

Directors be adopted, with certain preliminary language stricken regarding the ownership of IHB, makeup of the IHB Board, and history of rental and O&M Expense payments between IHB and Conrail.

57.     Following a roll call vote, the IHB Board, including the Majority Directors acting as agents of the Majority Owners/Landlords, unanimously passed the resolution proposed by Mr. Werner (the "IHB Board Resolution," a true and correct copy of which is attached as Exhibit A).

58.     Notwithstanding previous collusive attempts by the Majority Owners/Landlords to increase the rental rates proposed in the IHB Management Recommendation, the IHB Board Resolution approved annual rental payments to NS of $642,700, to CSX of $341,714, and to Conrail of $362,285, which were the same rental rates proposed in the IHB Management Recommendation.

59.     The IHB Board Resolution expressly stated that it was based on "an independent and neutral evaluation reflecting the market rate of rent and market terms and conditions for Trackage Rights Agreements with" the Majority Owners/Landlords.

60.     The IHB Board Resolution also expressly required "each Authorized Officer" to "execute and deliver, on behalf of the IHB the transaction documents constituting the IHB Management Recommendation."

## DEFENDANTS UNLAWFULLY UNDERMINE THE IHB BOARD RESOLUTION

61.     Despite having just agreed to the terms of the IHB Management Recommendation and the IHB Board Resolution, the Majority Owners/Landlords immediately embarked upon additional coercive and oppressive behavior aimed at influencing IHB management to reject the terms of its own recommendation and the binding IHB Board Resolution.

62.     In a December 13, 2016 letter to Mr. Daly, Conrail rejected the rental rates set

11

forth in the IHB Board Resolution and took issue with the independent valuation and return on investment analyses on which the IHB Management Recommendation was based.

63.     In a letter to CP dated January 6, 2017, Conrail denied that it had a fiduciary duty to accept the IHB Board Resolution.  Conrail further threatened that, if Conrail could not reach an agreement with IHB on the appropriate rental amounts, it would ask the STB to intervene.

64.     Conrail wrote another letter to IHB on or about January 17, 2017, to IHB, demanding that IHB management agree to an annual rental payment to Conrail of between $1.9 million and $2.57 million.  If IHB management disagreed with the demand, Conrail threatened to commence a proceeding "very soon" to have the STB determine the appropriate compensation.

65.     NS sent a letter to Mr. Daly on or about December 27, 2016, which indicated that NS and IHB management had previously agreed behind closed doors to a $1.85 million annual rental rate.  NS demanded that Mr. Daly "take the $1.85mm agreed-to rental back to your Board for approval . . . ."  Despite not charging rent to IHB since 1999, NS further demanded that IHB pay NS for "all amounts due under the 1906 agreement for prior years' use of NS property . . . ."

66.     On January 6, 2017, CSX demanded by an email to Mr. Daly that IHB pay a monthly rent of $140,000, which amounts to an annual rental rate of $1.68 million.  If IHB management disagreed, CSX threatened to evict IHB or disallow its use of the Rail Properties. CSX further demanded that IHB pay CSX all accrued rent for past use of CSX-owned properties.

## DEFENDANTS COERCE IHB'S ACCEPTANCE OF AN EXORBITANT RENTAL AGREEMENT

67.     Accordingly, rather than comply with the IHB Board Resolution's directive to implement the IHB Management Recommendation, the Majority Owners/Landlords intentionally coerced IHB management into accepting exorbitant rental rates to be approved at a special meeting of the IHB Board on February 1, 2017, which was called by Conrail.

12

68.     This coercion was made apparent by materials distributed to the IHB Board in a January 26, 2017 email from Jocelyn Hill, Conrail Assistant General Counsel and Secretary to the IHB Board.

69.     Specifically, Ms. Hill circulated copies of proposed draft minutes from the December 7, 2016 Board meeting that contained gross misstatements as to what was said and agreed to at the meeting with respect to the IHB Management Recommendation.

70.     Ms. Hill also circulated copies of a new draft trackage rights agreement ("Revised Master Trackage Rights Agreement") and a proposed resolution to adopt the Revised Master Trackage Rights Agreement, both of which departed significantly from the terms agreed to in the IHB Board Resolution.  For example, the Revised Master Trackage Rights Agreement would require IHB to pay approximately $5 million in annual rent, with $2,130,559 to Conrail, $1,150,000 to CSX, and $1,750,000 to NS.  In addition, even though the 1906 Agreement stated that all IHB-funded improvements would become IHB property, the Revised Master Trackage Rights Agreement provided that "ownership of all capital improvements shall reside with the Owner of the Property."  The proposed resolution also stated that IHB management had reached an agreement with the Majority Owners/Landlords to pay rent that was allegedly past due.

71.     The email from Ms. Hill also attached revised financial projections for IHB that provided a slightly more optimistic cash flow projection for 2019 and 2020 than what was provided at the December 7, 2016 Board meeting.  Although the December 7 projections stated that IHB would be in a negative cash position in 2019 and 2020 had it accepted Defendants' exorbitant proposed rental rates, the revised materials showed that IHB would experience slightly positive cash flows for those years if it accepted the Revised Master Trackage Rights Agreement.  Despite this more optimistic outlook, however, these projections would still be

13

insufficient for IHB to pay dividends to its owners.

72.     After Mr. Daly acknowledged that the threats from the Majority Owners/Landlords compelled him to change IHB management's position, the IHB Board adopted the proposed resolution and Revised Master Trackage Rights Agreement. The Majority Directors—acting as agents of the Majority Owners/Landlords—voted in favor of the resolution while the Minority Directors—acting as agents of CP—voted against it. Accordingly, the Majority Owners/Landlords succeeded in coercing IHB management by threatening to evict IHB unless it accepted the revised agreement (even though they had no right to do so without first seeking STB approval) and by demanding that IHB pay accrued back rent (even though, upon information and belief, Conrail waived this obligation in 1999).

73.     Throughout the course of the above negotiations, CP has supported IHB management's efforts to negotiate a new trackage rights agreement on terms that are fair to IHB, reflect market values for such rail property, are in the best interests of IHB's shareholders, and that support IHB's continued financial viability. In contrast, the Majority Owners/Landlords have engaged in a pattern of coercive and oppressive behavior adverse to IHB's interests including, but not limited to, self-dealing, unauthorized conduct, refusal to disclose material information, demanding and approving the onerous Revised Master Trackage Rights Agreement while refusing to declare any dividends, threatening to withdraw operating rights without legal justification, and other acts constituting breaches of their fiduciary duties under Indiana law.

## COUNT I
### Breach of Fiduciary Duties
#### (Against All Defendants, Excluding IHB)

74.     CP re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

14

75.     IHB is a closely held corporation under Indiana law.   As such, all IHB shareholders owe one another a fiduciary duty of utmost good faith and loyalty and have a duty to act toward one another in an honest, fair, and reasonable manner.   These duties include a Duty of Loyalty that prohibits acting out of avarice, expediency, or self-interest in derogation of the interests of IHB and its shareholders.

76.     In addition, as the minority shareholder in IHB, CP has a reasonable expectation that it would have a voice in, and participation in, the operation and management of IHB.   Those reasonable expectations were known and understood by the Majority Owners/Landlords.

77.     The Majority Owners/Landlords have breached their fiduciary duties to CP and IHB by failing to act with utmost good faith and loyalty; by failing to act toward CP and IHB in an honest, fair, and reasonable manner; by committing corporate waste and oppression; by defeating CP's reasonable expectations of a voice in, and participation in, the operation and management of IHB; and by engaging in self-dealing at the expense of IHB's and CP's interests.

78.     Specifically, through coercing IHB management's acceptance of the Revised Master Trackage Rights Agreement, the Majority Owners/Landlords compelled IHB to depart from a more than 100-year course of dealing between Conrail and IHB and pay grossly excessive rental rates that could lead to the financial insolvency of IHB.

79.     Despite their obligations to act in IHB's and CP's best interest, the Majority Owners/Landlords actively negotiated against IHB's interests by demanding that IHB pay rental rates significantly greater than those set forth in the IHB Management Recommendation, placing their own interests above the interests of IHB and its shareholders.

80.     The Revised Master Trackage Rights Agreement includes rental rates that grossly exceed market standards, and are grossly in excess of those approved by IHB management in the

15

IHB Management Recommendation.

81.    These grossly excessive and onerous rates pose a serious threat to IHB's continued financial solvency.

82.    The Majority Owners/Landlords have failed to fulfill their fiduciary duties to ensure that the transaction was reasonable and not excessive.  By breaching their fiduciary duties, the Majority Owners/Landlords have wasted corporate assets that should have been preserved as operating capital in a down economy, or which otherwise would be available for distributions to IHB's shareholders.

83.    The Majority Owners/Landlords have also committed corporate waste and breached their fiduciary duties by demanding that IHB pay excessive amounts of back rent that they claim IHB owes for operating over their property since 1999, even though they are aware that they have no basis in law or fact to demand payment of these amounts.

84.    The Majority Owners/Landlords have also breached their fiduciary duties to CP by defeating its reasonable expectations of a voice in, and participation in, the operation and management of IHB.

85.    Specifically, despite the fact that the IHB Board unanimously passed the IHB Board Resolution, directing IHB's shareholders to implement the IHB Management Recommendation, the Majority Owners/Landlords engaged in closed-door negotiations in contravention of the IHB Board Resolution.  The result of those negotiations was approved by the Majority Directors, acting as agents for the Majority Owners/Landlords.

86.    CP, as a minority shareholder, had the right to participate in these negotiations with IHB management, but was prevented from doing so by the Majority Owners/Landlords.

87.    By including higher rental rates in direct contravention of the IHB Management

16

Recommendation, the Revised Master Trackage Rights Agreement constitutes a self-interested transaction because the Majority Owners/Landlords are acting to benefit the Majority Owners/Landlords at the expense of IHB's shareholders.

88.     IHB could have obtained a better bargain, as indicated in the IHB Management Recommendation and IHB Board Resolution.  Instead, the Majority Owners/Landlords diverted for their own purposes the corporate gain that IHB could have realized through the IHB Management Recommendation, and they failed to provide full disclosures to IHB, CP, or IHB's Minority Directors.

89.     By virtue of the Majority Owners/Landlords' breaches of their fiduciary duties as set forth herein, CP is entitled to any and all equitable and legal remedies that this Court may deem just and proper, including, without limitation, the return to IHB of all rental payments made to and profits earned by the Majority Owners/Landlords under the Revised Master Trackage Rights Agreement, damages in an amount to be determined at trial, a declaration that the Revised Master Trackage Rights Agreement is void, an injunction compelling the Majority Owners/Landlords to implement and enforce the IHB Board Resolution, an award to IHB of all O&M Expenses that Conrail was obligated to pay pursuant to the terms of the 1906 Agreement, payment of CP's applicable expenses and attorney's fees incurred herein, and such further relief as the Court deems just and proper.

90.     Furthermore, CP is entitled to an award of punitive damages in an amount to be determined at trial, on the basis that the Majority Owners/Landlords' breaches of their fiduciary duties were wanton, willful, intentionally oppressive, and/or malicious.

CORE/9990000.7432/132007919.1

## COUNT II
## Aiding and Abetting Breach of Fiduciary Duties
## (Against NS and CSX)

91.   CP re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

92.   NS and CSX owe fiduciary duties to IHB and its shareholders because they are joint owners of and exercise control over Conrail, and because they exercise control over IHB by virtue of Conrail's majority interest in IHB.

93.   Alternatively, if NS and CSX do not owe fiduciary duties to IHB and its shareholders, they are liable as aiders and abettors of Conrail's breaches of fiduciary duties as set forth in this Complaint.

94.   Specifically, as set forth in the preceding paragraphs, Conrail owed IHB and CP fiduciary duties as the majority shareholder of IHB.

95.   Conrail breached its fiduciary duties to IHB and CP as set forth in the preceding paragraphs.

96.   NS and CSX knowingly and substantially assisted Conrail in the breach of its fiduciary duties by taking the actions alleged in the preceding paragraphs.

97.   NS and CSX were aware of their role when assisting in Conrail's breaches of fiduciary duties, and knowingly and intentionally joined Conrail in their breaches of those duties.

98.   Through NS's and CSX's assistance in Conrail's breaches of fiduciary duties, CP is entitled to any and all equitable and legal remedies that this Court may deem just and proper, including, without limitation, the return to IHB of all rental payments made to and profits earned by the Majority Owners/Landlords under the Revised Master Trackage Rights Agreement, damages in an amount to be determined at trial, a declaration that the Revised Master Trackage

CORE/9990000.7432/132007919.1

Rights Agreement is void, an injunction compelling the Majority Owners/Landlords to implement and enforce the IHB Board Resolution, an award to IHB of all O&M Expenses that Conrail was obligated to pay pursuant to the terms of the 1906 Agreement, payment of CP's applicable expenses and attorney's fees incurred herein, and such further relief as the Court deems just and proper.

99.     Furthermore, CP is entitled to an award of punitive damages in an amount to be determined at trial, on the basis that NS's and CSX's conduct in assisting these breaches of fiduciary duties was wanton, willful, intentionally oppressive, and/or malicious.

### CP'S DIRECT CLAIMS UNDER INDIANA LAW

100.     CP's claims asserted in this action are direct claims because the harm caused by the Majority Owners/Landlords is suffered uniquely by CP.

101.     Among other things, if the Majority Owners/Landlords' actions are allowed to stand, CP would be deprived of any distributions or dividends that would otherwise be available for the benefit of all of IHB's shareholders.  The Majority Owners/Landlords' actions have the practical effect of appropriating all distributions and dividends to the Majority Owners/Landlords, causing unique and individual harm to CP.

102.     Alternatively, because IHB is an Indiana closely held corporation, the Court, in its discretion, may treat an action raising derivative claims as a direct action.  To the extent the Court were to view CP's claims herein as derivative, the court should exercise its discretion to treat the action as direct  for the following reasons:

(a)     IHB is a closely held corporation with only two shareholders, and allowing this action to proceed as a direct action would not expose IHB to a multiplicity of suits;

(b)     A direct action would not prejudice IHB's creditors—to the contrary, the relief

sought by CP herein would protect IHB's financial position and ability to pay its creditors; and

(c)     A direct action would not interfere with a fair distribution of funds because CP is the party who would ultimately be harmed if the exorbitant and unfair rental rates being forced upon IHB by its majority shareholder and captive Majority Directors are allowed to stand.

### DEMAND REQUIREMENT IS OTHERWISE EXCUSED AS FUTILE

103.    To the extent that the claims asserted and relief sought by CP as the minority shareholder in IHB are derivative in nature, a demand should be excused as futile because a majority of the IHB Board is comprised of interested directors and IHB's majority shareholder is implicated in this dispute.

104.    In addition, CP has made repeated requests to the Majority Owners/Landlords and the Majority Directors to take actions consistent with the relief requested herein, and those requests have been ignored.

105.    By bringing this action without first making a formal demand, CP will not unfairly expose IHB or the other named defendants to multiple actions, materially prejudice the interests of IHB's creditors, or interfere with a fair distribution of the recovery among all interested persons.  In particular, Conrail's actions—taken through NS and CSX—will cause injury to only one shareholder, CP, and will not injure the only remaining shareholder, Conrail.

**WHEREFORE**, CP prays that the Court enter judgment in its favor, and against Defendants, as follows:

1.      Finding that the Majority Owners/Landlords have breached their fiduciary duties as shareholders, and awarding damages for said breaches of fiduciary duties in an amount to be

determined at trial;

2.      Awarding CP punitive damages, in an amount to be determined at trial, on the basis that the Majority Owners/Landlords' breaches of their fiduciary duties were wanton, willful, intentionally oppressive, or malicious;

3.      Awarding IHB the O&M Expenses that Conrail was obligated to pay pursuant to the terms of the 1906 Agreement;

4.      Ordering the Majority Owners/Landlords to disgorge any ill-gotten profits resulting from IHB's payments under the Revised Master Trackage Rights Agreement;

5.      Voiding the Revised Master Trackage Rights Agreement;

6.      Entering an injunction compelling Defendants to implement and enforce the IHB Board Resolution;

7.      Awarding CP its costs and reasonable attorneys' fees incurred herein; and

8.      Awarding any other relief that the Court deems just and equitable.

## JURY TRIAL DEMANDED

CP demands a trial by jury of all issues so triable.

**EICHHORN & EICHHORN, LLP**

Dated: March 6, 2017        By: /s/ David C. Jensen
                           David C. Jensen, #4893-45
                           200 Russell Street, P.O. Box 632
                           Hammond, IN  46325
                           (219) 931-0560
                           Fax: (219) 931-5370
                           Email: djensen@eichhorn-law.com

David C. Jensen, #4893-45
John P. Twohy, #19603-53
EICHHORN & EICHHORN, LLP
200 Russell Street
P.O. Box 6328
Hammond, IN  46320
Telephone:  (219) 931-0560
Telephone:  (219) 931-5370

CORE/2049518.0202/131562295.15

## VERIFICATION

| | |
|---|---|
| CITY OF CALGARY | ) |
| | ) |
| PROVINCE OF ALBERTA | ) ss |
| | ) |
| CANADA | ) |

I, James Clements, being first duly sworn, depose and state that I am a duly authorized agent of the corporate plaintiff bringing the foregoing Complaint, that I have read the Complaint, and that the facts therein are true to my knowledge, except as to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.



JAMES CLEMENTS

Subscribed and sworn to before me
this 06 day of March, 2017.

Notary Public in and for the Province of Alberta

Cassandra P. Quach
Barrister & Solicitor
A Notary Public - Commissioner for Oaths
in and for the Province of Alberta

NOTARY
PUBLIC
CASSANDRA P. QUACH
PROVINCE OF ALBERTA