# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| SOO LINE RAILROAD COMPANY, | ) | |
| d/b/a/ CANADIAN PACIFIC, | ) | |
| a Minnesota corporation, | ) | Case No.:  2:17-cv-106 |
| | ) | |
| Plaintiff, | ) | Judge Rudy Lozano |
| | ) | |
| vs. | ) | Magistrate Judge Andrew Rodovich |
| | ) | |
| CONRAIL, INC., a Pennsylvania | ) | |
| corporation; | ) | |
| | ) | |
| CONSOLIDATED RAIL | ) | |
| CORPORATION, a Pennsylvania | ) | |
| corporation; | ) | |
| | ) | |
| NORFOLK SOUTHERN | ) | |
| CORPORATION, a Virginia corporation; | ) | |
| | ) | |
| NORFOLK SOUTHERN | ) | |
| RAILWAY COMPANY; a Virginia | ) | |
| corporation; | ) | |
| | ) | |
| CSX CORPORATION, a Virginia | ) | |
| corporation; | ) | |
| | ) | |
| CSX TRANSPORTATION, INC., a | ) | |
| Virginia corporation; | ) | |
| | ) | |
| CSX RAIL HOLDING CORPORATION, | ) | |
| a Delaware corporation; | ) | |
| | ) | |
| GREEN ACQUISITION CORP., a | ) | |
| Pennsylvania corporation; | ) | |
| | ) | |
| CRR HOLDINGS, LLC, a Delaware | ) | |
| limited liability company; | ) | |
| | ) | |
| the INDIANA HARBOR BELT | ) | |
| RAILROAD COMPANY, an | ) | |
| Indiana corporation; | ) | |
| | ) | |
| Terry Evans; John Hart; Mike Pendergrass; | ) | |
| and Tom Werner; | ) | |

)
Defendants.           )
)

---

### VERIFIED FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

---

Plaintiff Soo Line Railroad Company, d/b/a Canadian Pacific ("CP") states and alleges as follows:

### THE PARTIES

1.     CP is a Minnesota corporation with its principal place of business located in Minneapolis, Minnesota.

2.     Defendant Conrail, Inc. ("CRR") is a Pennsylvania corporation with its principal place of business located in Philadelphia, Pennsylvania.

3.     Defendant Norfolk Southern Corporation ("NS") is a Virginia corporation with its principal place of business located in Norfolk, Virginia.

4.     Defendant CSX Corporation ("CSX") is a Virginia corporation with its principal place of business located in Jacksonville, Florida.  (Defendants CRR, NS, and CSX are hereinafter referred to as the "Parent Entities.")

5.     Defendant Consolidated Rail Corporation ("CRC") is a Pennsylvania corporation with its principal place of business located in Philadelphia, Pennsylvania.

6.     Defendant Norfolk Southern Railway Company ("NSR") is a Virginia corporation with its principal place of business located in Norfolk, Virginia.

7.     Defendant CSX Transportation, Inc. ("CSXT") is a Virginia corporation with its principal place of business located in Jacksonville, Florida.  (Defendants CRC, NSR, and CSXT are hereinafter referred to collectively as the "Landlords.")

2

8.      Defendant Green Acquisition Corp. ("Green") is a Pennsylvania corporation with its principal place of business located in Philadelphia, Pennsylvania.

9.      Defendant CSX Rail Holding Corporation ("CSXRH") is a Delaware corporation with its principal place of business located in Jacksonville, Florida.

10.     Defendant CRR Holdings, LLC is a Delaware limited liability company with its principal place of business in Philadelphia, Pennsylvania.  CRR Holdings, LLC's sole members are CSXRH (a Delaware citizen) and NS (a Virginia citizen).  (Defendants Green, CSXRH, and CRR Holdings are hereinafter referred to collectively as the "Holding Entities.")

11.     Defendant Indiana Harbor Belt Railroad Company ("IHB") is an Indiana corporation with its principal place of business located in Hammond, Indiana.

12.     Defendants John Hart and Mike Pendergrass are, at all relevant times herein, CSX executives.

13.     Defendants Terry Evans and Tom Werner are, at all relevant times herein, NS executives.

14.     Defendant Hart is a Florida citizen.

15.     Defendant Pendergrass is a Florida citizen.

16.     Defendant Evans is a Virginia citizen.

17.     Defendant Werner is a Virginia citizen.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and it is between citizens of different states.

19.     This Court has both personal and subject matter jurisdiction over the parties and

3

matters herein.

20.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to CP's claims occurred in this district, and a substantial part of the property that is the subject of this dispute is located in this district.

## BACKGROUND

### I.     OWNERSHIP STRUCTURE OF IHB.

21.     According to NSR and CSXT, the seven directors and four senior managers of IHB each own one share of IHB, which represents less than 1/10 of 1% of the IHB's equity interests.

22.     Apart from this minor ownership interest, CP and CRC are the sole shareholders of IHB.

23.     Defendant CRC currently owns approximately fifty-one percent (51%) of the stock in IHB, and is thus the controlling majority shareholder.

24.     Plaintiff CP currently owns approximately forty-nine percent (49%) of the stock in IHB, and is thus the minority shareholder.

25.     IHB's shares are not traded in any securities market.

26.     Pursuant to an agreement approved by the Surface Transportation Board ("STB") in 1998 ("Merger Agreement"), CSX and NS became the sole owners of CRC, through various holding entities.  *See CSX Corp. et al.—Control & Operating Leases/Agreements—Conrail, Inc. et al.*, 3 S.T.B. 196 (served July 23, 1998).

27.     CRC is a wholly-owned subsidiary of CRR.

28.     CRR is a wholly-owned subsidiary of Green.

29.     Green is a wholly-owned subsidiary of CRR Holdings.

4

30. NS directly owns 58% of the equity interests of CRR Holdings.

31. CSX, through its wholly-owned subsidiary CSXRH, owns 42% of the equity interests of CRR Holdings.

32. NS and CSX each have a 50% voting interest in CRR Holdings.

33. Consequently, Defendants NS and CSX control CRC by virtue of their voting and ownership interests in CRR Holdings.

## II.     IHB OPERATIONS AND CONTROL.

34. IHB is a switch carrier which operates generally within the Chicago area.

35. IHB operates on property owned by the Landlords in Lake County, Indiana and Cook County, Illinois ("Rail Properties").

36. The Chicago rail corridor is one of the busiest rail hubs in the world.

37. IHB serves many customers in the Chicago area and functions to ensure that the many railroads which move through Chicago can do so efficiently via the IHB, which then connects with multiple other rail carriers.

38. Through an agreement entered into by CRC's predecessor and IHB on April 9, 1906 ("1906 Agreement"), CRC's predecessor granted IHB rights to occupy and operate over the Rail Properties.

39. The original 1906 Agreement was to last for ninety-nine (99) years.

40. The obligations included within the 1906 Agreement run with the land and are binding on CRC's and IHB's successors.

41. Pursuant to a 1999 agreement ("1999 Agreement") approved by the Surface Transportation Board ("STB") and entered into in connection with the Merger Agreement, CSX and NS possess an equal right to direct the exercise of CRC's ownership rights regarding IHB

5

and to select an equal number of IHB directors to be appointed by CRC.

42.     The 1999 Agreement has a twenty-five year term. *See* 1999 Agreement § 5.

43.     At all relevant times herein, Defendants John Hart and Mike Pendergrass are IHB's CSX-appointed directors.

44.     At all relevant times herein, Defendants Terry Evans and Tom Werner are IHB's NS-appointed directors (with Hart and Pendergrass, collectively the "Majority Directors").

45.     At all relevant times herein, Steven Nettleton, Tom Albanese, and James Clements are the remaining IHB directors, and are employed by CP or its affiliates and appointed to the IHB Board by CP (collectively, the "Minority Directors").

46.     Pursuant to the 1999 Agreement, the Majority Directors vote as a bloc on matters relating to IHB.

47.     The 1999 Agreement also requires NS and CSX to cause CRC to replace the expired 1906 Agreement with an agreement on the "same basis as and for a term of years equal to" the 1906 Agreement. *See* 1999 Agreement § 4(c).

48.     NS and CSX thus exercise control over IHB by virtue of CRC's majority interest in IHB, CRC's majority position on the IHB Board, and the 1999 Agreement directing NS and CSX to vote as a bloc on matters relating to IHB.

**III.     THE 1906 AGREEMENT.**

49.     Pursuant to the 1906 Agreement, IHB paid CRC an annual depreciation-adjusted rent of approximately $150,000 to operate over the Rail Properties.

50.     That rent was calculated to achieve a five percent (5%) return on investment, based on agreed-upon property valuations and the parties' proportional use of the assets.

51.     Pursuant to the terms of the 1906 Agreement (Art. VII § 3), upon information and

CORE/2049518.0202/133393866.6

belief, CRC paid $1 to $2 million per year to IHB to account for CRC's proportional responsibility for certain operating and maintenance expenses associated with the Rail Properties ("O&M Expenses").

52.     The obligations of CRC and IHB set forth in the 1906 Agreement, including IHB's annual rental payments to CRC, remained largely unchanged until 1999.

53.     In 1999, CRC stopped invoicing the IHB for rent under the 1906 Agreement, so the IHB did not have any rental payments to make.

54.     In 1999, CRC stopped paying O&M Expenses to the IHB.

55.     Upon information and belief, CRC and IHB management entered into a quid pro quo agreement in 1999 without the consent of the IHB Board to allow CRC to avoid its obligation under the 1906 Agreement to pay certain O&M Expenses, which totaled approximately $2.3 million in 1998, and for IHB to stop paying rent to CRC.

## IV.     THE 2011 TERM SHEET.

56.     In 2011, Defendants (excluding IHB) began a concerted effort to cause IHB to enter into a new trackage rights agreement that included extortionate rental rates, to the detriment of IHB and CP.

57.     Specifically, on or around November 16, 2011, CRC—acting on behalf of the Landlords and, upon information and belief, the Parent Entities and Holding Entities—presented IHB's former General Manager Jim Roots with a term sheet for a proposed "lease" between IHB and CRC ("2011 Term Sheet").

58.     The 2011 Term Sheet would have required IHB to pay an annual base rental rate of $5,500,000, with annual adjustments to be made based on the Consumer Price Index.

59.     The proposed rental payments under the 2011 Term Sheet constituted an increase

CORE/2049518.0202/133393866.6

of approximately 3,566% from the rent paid by IHB under the 1906 Agreement.

60.    Even though the 2011 Term Sheet covered increased rent demands for three separate parcels, each owned separately by the different Landlords, upon information and belief the methodologies for calculating the proposed escalated rent on each parcel were the same, indicating that the Landlords—and, upon information and belief, the Parent Entities and Holding Entities—colluded in establishing those rates to the detriment of IHB and CP.

61.    At the IHB Board's direction, and after formal review of the 2011 Term Sheet, IHB management presented a white paper to the IHB Board on March 2, 2012 (the "White Paper"), expressing IHB management's numerous concerns with the proposed agreement.

62.    IHB management's concerns with the 2011 Term Sheet included, without limitation:  (1) the 2011 Term Sheet was akin to a ground lease and did not cover all of the operating issues inherent to the IHB contained within the 1906 Agreement; (2) the 2011 Term Sheet proposed an initial five-year term with renewal options as opposed to a long-term arrangement; (3) upon termination of the lease, IHB would be required to make filings with the STB to vacate the premises; and (4) IHB would be required to surrender to CRC millions of dollars in improvements IHB made to the Rail Properties even though the 1906 Agreement treated those improvements as IHB property (Art. III § 2).

63.    The White Paper also rejected the rental rates proposed in the 2011 Term Sheet, which were based on an inaccurate appraisal of assets prepared by RMI Midwest ("RMI Appraisal").

64.    Upon information and belief, the RMI Appraisal was prepared for CRC.

65.    The annual rent contemplated by the 2011 Term Sheet was equal to 10% of the property's inflated appraised value under the RMI Appraisal.

8

66.    A 10% annual rate of return is inconsistent with the railroad industry's standard shortline lease rates, and problematic in light of the short five-year term contemplated by the 2011 Term Sheet.

67.    The RMI Appraisal is biased toward CRC, which procured it, and contains numerous errors.  The RMI Appraisal is erroneous because, without limitation:  (1) it based its valuations upon the highest and best commercial use of the land in urban Chicago; (2) it failed to account for the considerable regulatory constraints that would prevent conversion of the Rail Properties from railroad use to conventional commercial use; (3) it added a 60% premium for a "corridor enhancement factor"; and (4) it included approximately $35 million in assets such as rail and other improvements for which IHB, not CRC, had funded *entirely on its own*.

68.    IHB management determined that the massive cost increase proposed within the 2011 Term Sheet posed a serious threat to IHB's financial viability, and could render IHB insolvent, thus jeopardizing not only IHB, but efficient rail traffic through Chicago in general.

69.    In mid-April of 2012, CRC—acting on behalf of the Landlords and, upon information and belief, the Parent Entities and Holding Entities—responded to the White Paper with a new proposed memorandum of understanding ("MOU").

70.    The MOU not only ignored IHB management's concerns expressed in the White Paper, it proposed conditions that were even more onerous than those set forth in the 2011 Term Sheet with respect to, among other things, rental rate, duration, valuation of land, acreage, credit for IHB improvements, and operating terms.

V.    THE 2015 PROPOSED MASTER TRACKAGE RIGHTS AGREEMENT.

71.    Discussions over the proposed lease and the 2011 Term Sheet stalled thereafter.

72.    At the December 2014 IHB Board meeting, CP-appointed director James

9

Clements suggested that the Board find a use for the company's excess cash reserves; for example, by distributing those reserves as dividends to the company's two shareholders, CP and CRC.

73.     Mr. Clements raised the matter of IHB's excess cash reserves again at the March 2015 Board meeting.

74.     Shortly thereafter, Defendants (excluding IHB) engaged once again in a joint effort to cause IHB to enter into an onerous trackage rights agreement.  Defendant Landlords—acting on their own behalf and on behalf of the Parent Entities and Holding Entities—proposed a new master trackage rights agreement (the "Proposed Master Trackage Rights Agreement") to IHB that again included conditions more onerous than those set forth in the 2011 Term Sheet.

75.     For example, under the new Proposed Master Trackage Rights Agreement, IHB would initially owe annual rent of $7.4 million to CRC, increasing to $8 million by 2020.

76.     Upon information and belief, the Landlords, Parent Entities, and Holding Entities created the Proposed Master Trackage Rights Agreement in concert with each other, even though each Landlord, Parent Entity, and Holding Entity is a legally distinct entity and each Landlord separately owns the individual parcels on which the IHB operates.

77.     The purpose and effect of the exorbitant rental rates contained in the Proposed Master Trackage Rights Agreement are to require IHB to drain its accumulated excess cash reserves to make increased annual rental payments to CRC, rather than distributing those reserves in the form of dividends to all of its shareholders, including Plaintiff CP.

78.     Such a diversion of IHB reserves would deprive CP of its rights to dividends as a 49% owner of IHB.

79.     At a March 3, 2016, board meeting, IHB management declared that the terms in

CORE/2049518.0202/133393866.6

the Proposed Master Trackage Rights Agreement were not in IHB's best interest because, in part, IHB's ending cash position by 2020 would be negative $5.9 million.

80.     This potential insolvency contrasted sharply with IHB's substantial positive ending cash balances projected in IHB's base plan at that time.

81.     After the March 3, 2016, IHB Board meeting, the CP-appointed Minority Directors complained that they had not previously been given information relating to the negotiations over the Proposed Master Trackage Rights Agreement.

82.     In particular, these Minority Directors were not provided with the appraisals apparently prepared by RMI Midwest for NS which were being utilized by NS and CSX in connection with the negotiations, nor were they provided with an alleged $3.3 million "agreement" that was referenced during the Board meeting and which was supposedly signed by a former IHB General Manager.

83.     By letter dated March 16, 2016, Plaintiff CP objected to the Proposed Master Trackage Rights Agreement, noting that it was unacceptable for many of the same reasons that IHB management's White Paper rejected the 2011 Term Sheet.

84.     Among other concerns, CP noted the following:

  a.  The financial terms were still apparently based on the RMI Appraisal, which remained flawed for the reasons originally noted in the White Paper;

  b.  The rental rate calculation continued to confiscate and include the value of approximately $35 million in capital improvements funded entirely by IHB;

  c.  The structure of the proposed agreement, which continued to be in a lease format, was not an appropriate replacement for the 1906 Agreement; and

  d.  The agreement included property that IHB did not use, need, or want.

11

85.     CP further notified Defendant CRC that, from CP's perspective, the actions being contemplated by CRC and IHB's Majority Directors were a thinly veiled attempt to divert cash—which would otherwise be available for distribution to IHB's shareholders—solely to CRC (for the ultimate benefit of Defendants NSR, CSXT, and the Parent Entities).

86.     CP pointed out that these actions were jeopardizing IHB's future viability and causing CP, as the minority IHB shareholder, direct harm because it would bear the impact of substantially all cost increases while Defendant CRC—and Defendants NSR, CSXT, and the Parent Entities indirectly—would receive all of the benefit.

## VI.     THE IHB MANAGEMENT RECOMMENDATION AND IHB BOARD RESOLUTION.

87.     On June 2, 2016, the IHB Board passed a resolution directing IHB management to provide CP and the Landlords all information necessary to determine the appropriate properties to be subject to an agreement, and to retain outside counsel and consultants (including an appraiser) to assist in evaluating and negotiating the terms of any new agreement.

88.     In September 2016, IHB management received independent market value estimates for the Rail Properties from Kenneth Young & Associates, and a return on investment analysis by AECOM recommending a 2.74% rental rate for the properties under consideration.

89.     IHB management believed the above estimates were fair, reasonable, and accurate.

90.     In September and October of 2016, IHB management offered proposals for a new agreement ("IHB Management Recommendation") to the Landlords, based on the Kenneth Young & Associates and AECOM analyses.

91.     The IHB Management Recommendation contemplated annual rental payments of $362,285 to CRC, $642,700 to NSR, and $341,714 to CSXT.

CORE/2049518.0202/133393866.6

92.     The IHB Management Recommendation is the product of thorough, independent analysis and consultation by IHB management, which owes fiduciary obligations to IHB and all of its constituent shareholders.

93.     In addition to being based on neutral appraisals and analyses by Kenneth Young & Associates and AECOM, the IHB Management Recommendation excludes from its valuation corridor enhancements as well as those substantial leasehold improvements that were paid for and are owned by IHB.

94.     Shortly after the IHB Management Recommendation was provided to them, Defendants (excluding IHB) continued to engage in a concerted effort to cause IHB to enter into a trackage rights agreement that included increased onerous rental rates, contrary to the interests of IHB and CP.

95.     Specifically, Defendant CRC—acting on its own behalf and on behalf of CSXT, NSR, the Parent Entities, and the Holding Entities—demanded that IHB make changes to the IHB Management Recommendation's proposed rental rates.

96.     In a letter dated November 14, 2016, Defendant CRC notified CP that CRC had reached a separate agreement with IHB management that included modifications to the CRC rental amounts provided in the IHB Management Recommendation.

97.     Upon information and belief, Defendant CRC sent this letter on its own behalf and on behalf of Defendants CSXT, NSR, the Parent Entities, and the Holding Entities.

98.     CP responded, stating that the IHB Management Recommendation was fair and reasonable, that it was unaware of any agreement to pay rental amounts other than those included in the recommendation, and that the Majority Directors, Landlords, and Parent Entities had a fiduciary duty to act in the best interests of IHB and its minority shareholder CP.

CORE/2049518.0202/133393866.6

99.     CP further stated that in the event the Majority Directors, Landlords, and Parent Entities were to seek more compensation or refuse the IHB Management Recommendation, additional scrutiny would be required to ensure they were not acting out of self-interest.

100.     CP also took issue with Defendant CRC's demand that IHB pay nearly $2.6 million in accrued rent since 1999, even though CRC had not paid approximately $20 million in operating expenses to IHB that accrued since that same time.

101.     IHB's General Manager, Pat Daly, presented the IHB Management Recommendation at the December 7, 2016, board meeting.

102.     Mr. Daly announced that IHB management rejected the latest proposal from the Landlords and Parent Entities to have IHB pay $5.6 million in annual rent, and IHB management continued to recommend that IHB agree to the terms of the IHB Management Recommendation.

103.     The CP-appointed Minority Directors then proposed a resolution to adopt the IHB Management Recommendation.

104.     The motion to adopt the resolution was denied, with the Majority Directors, acting as agents of the Landlords, Parent Entities, and Holding Entities, voting in a bloc against it.

105.     After additional discussion, Defendant Werner, acting as agent of Defendants (excluding IHB), moved to adopt a slightly modified version of the IHB Management Recommendation.

106.     Specifically, Defendant Werner proposed that the resolution originally introduced by the Minority Directors be adopted, with certain preliminary language stricken regarding the ownership of IHB, makeup of the IHB Board, and history of rental and O&M Expense payments between IHB and CRC.

107.     Following a roll call vote, the IHB Board, including the Majority Directors acting

as agents of the Landlords, Parent Entities, and Holding Entities, unanimously passed the resolution proposed by Defendant Werner (the "IHB Board Resolution," a true and correct copy of which is attached as Exhibit A).

108.    This IHB Board Resolution approved annual rental payments to NSR of $642,700, to CSXT of $341,714, and to CRC of $362,285, which were the same rental rates proposed in the IHB Management Recommendation.

109.    The IHB Board Resolution expressly stated that it was based on "an independent and neutral evaluation reflecting the market rate of rent and market terms and conditions for Trackage Rights Agreements with" the Landlords.

110.    The IHB Board Resolution also expressly required "each Authorized Officer" to "execute and deliver, on behalf of the IHB the transaction documents constituting the IHB Management Recommendation."

### VII.    DEFENDANTS UNLAWFULLY UNDERMINE THE IHB BOARD RESOLUTION.

111.    Despite having just voted to approve the terms of the IHB Management Recommendation and the IHB Board Resolution, the Landlords, Parent Entities, and Holding Entities—acting through their respective agents—agreed to immediately and collectively embark upon additional coercive and oppressive behavior aimed at influencing IHB management to backtrack and reject the terms of its own recommendation and the binding IHB Board Resolution in order to increase rent paid to the Landlord, to the benefit of Defendants (excluding IHB).

112.    This agreement is evidenced by the uniform course of conduct engaged in by the Landlords, Parent Entities, and Holding entities in the months following the passage of the IHB Board Resolution.

113.    On December 13, 2016, Jonathan Broder, Defendant CRC's Chief Legal

15

Officer—acting on behalf of CRC and/or its affiliates—wrote to Mr. Daly of the IHB, rejecting the rental rates just approved unanimously by the IHB Board.

114.    In a letter to CP dated January 6, 2017, CRC denied that CRC had a fiduciary duty to accept the IHB Board Resolution.

115.    In that letter, Defendant CRC further threatened that, if CRC could not reach another agreement with IHB on the appropriate rental amounts, CRC would ask the STB to intervene.

116.    CRC's Chief Legal Officer Broder—acting on behalf of CRC and/or its affiliates—wrote another letter to IHB on or about January 17, 2017, demanding that IHB management agree to an annual rental payment to CRC of between $1.9 million and $2.57 million.

117.    If IHB management disagreed with the demand, CRC threatened to commence a proceeding "very soon" to have the STB determine the appropriate compensation.

118.    On December 27, 2016, Randall Hunt, NS's Director of Joint Facilities—acting on behalf of NSR and/or its affiliates—also sent a letter to Mr. Daly indicating that NSR and IHB management had previously agreed behind closed doors to a $1.85 million annual rental rate.

119.    Defendant NSR demanded that Mr. Daly "take the $1.85mm agreed-to rental back to your Board for approval . . . ."

120.    Despite not charging rent to IHB since 1999, NSR further demanded that IHB pay NSR for "all amounts due under the 1906 agreement for prior years' use of NSR property . . . ."

121.    On January 6, 2017, Rick Hood, President of CSX affiliate CSX Real Property, Inc.—acting on behalf of CSXT and/or its affiliates—demanded by an email to Mr. Daly that

CORE/2049518.0202/133393866.6

IHB pay a monthly rent of $140,000, which amounts to an annual rental rate of $1.68 million.

122.   In that email, if IHB management disagreed, CSXT threatened to evict IHB or disallow its use of the Rail Properties, which would disrupt Chicago rail operations for CP and other carriers.

123.   In that email, Defendant CSXT further demanded that IHB pay CSXT all accrued rent for past use of CSXT-owned properties.

## VIII.   DEFENDANTS COERCE IHB'S ACCEPTANCE OF AN EXORBITANT RENTAL AGREEMENT.

124.   Accordingly, rather than comply with the IHB Board Resolution's directive to implement the IHB Management Recommendation, the Majority Directors, Landlords, Parent Entities, and Holding Entities intentionally and collectively coerced IHB management into accepting exorbitant rental rates to be approved at a special meeting of the IHB Board on February 1, 2017, which was called by CRC.

125.   This coercion was made apparent by materials distributed to the IHB Board in a January 26, 2017, email from Jocelyn Hill, CRC Assistant General Counsel and Secretary to the IHB Board.

126.   Specifically, Ms. Hill circulated copies of proposed draft minutes from the December 7, 2016, IHB Board meeting that contained gross misstatements as to what was said and agreed to at the meeting with respect to the IHB Management Recommendation.

127.   Ms. Hill also circulated copies of a new draft trackage rights agreement ("Revised Master Trackage Rights Agreement") and a proposed resolution to adopt the Revised Master Trackage Rights Agreement, both of which departed significantly from the terms already agreed to in the IHB Board Resolution.

128.   For example, the Revised Master Trackage Rights Agreement would require IHB

CORE/2049518.0202/133393866.6

to pay approximately $5 million in annual rent, with $2,130,559 to CRC, $1,150,000 to CSXT, and $1,750,000 to NSR.

129.   In addition, even though the 1906 Agreement stated that all IHB-funded improvements would become IHB property, the Revised Master Trackage Rights Agreement provided that "ownership of all capital improvements shall reside with the Owner of the Property."

130.   The proposed resolution also stated that IHB management had reached an agreement with the Landlords to pay rent that was allegedly past due.

131.   The email from Ms. Hill also attached revised financial projections for IHB that provided a slightly more optimistic cash flow projection for 2019 and 2020 than what was provided at the December 7, 2016 Board meeting.

132.   Although the December 7 projections stated that IHB would be in a negative cash position in 2019 and 2020 if it were to accept the exorbitant rental rates proposed by the Landlords and their affiliates, the revised materials showed that IHB would experience slightly positive cash flows for those years if it accepted the Revised Master Trackage Rights Agreement.

133.   Despite this more optimistic outlook, however, these projections would still have the effect of draining IHB's cash reserves which would render IHB incapable of paying dividends to its owners, including Plaintiff CP.

134.   During this specially called meeting, IHB's Mr. Daly acknowledged that the threats from the Landlords and their affiliates compelled him to change IHB management's position.

135.   The IHB Board thus adopted the proposed resolution and Revised Master Trackage Rights Agreement.

CORE/2049518.0202/133393866.6

136.     The Majority Directors—acting as agents of the Landlords, Parent Entities, and Holding Entities—voted in favor of the resolution.

137.     The Minority Directors—acting as agents of CP—voted against it.

138.     Accordingly, Defendants (excluding IHB) succeeded in their collective effort to coerce IHB management to induce IHB to make massively increased payments to Defendants, contrary to the unanimous resolution IHB had just approved.

139.     Throughout the course of the above events, CP has supported IHB management's efforts to negotiate a new trackage rights agreement on terms that are fair to IHB, reflect market values for such rail property, are in the best interests of IHB's shareholders, and that support IHB's continued financial viability.

140.     In contrast, Defendants (excluding IHB) have engaged in a pattern of coercive and oppressive behavior adverse to IHB's interests including, but not limited to, self-dealing, unauthorized conduct, refusal to disclose material information, demanding and approving the onerous Revised Master Trackage Rights Agreement while refusing to declare any dividends, threatening to withdraw operating rights without legal justification, and other acts constituting breaches of their fiduciary duties under Indiana law.

**COUNT I**
**Breach of Fiduciary Duties**
**(Against CRC, the Majority Directors, and the Parent Entities)**

141.     CP re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

142.     IHB is a closely held corporation under Indiana law.

143.     As such, all IHB shareholders and directors owe one another a fiduciary duty of utmost good faith and loyalty and have a duty to act toward one another in an honest, fair, and

reasonable manner.

144.     These duties include a Duty of Loyalty that prohibits acting out of avarice, expediency, or self-interest in derogation of the interests of IHB and its shareholders.

145.     In addition, as the minority shareholder in IHB, Plaintiff CP has a reasonable expectation that it would have a voice in, and participation in, the operation and management of IHB.

146.     Those reasonable expectations were known and understood by Defendants.

147.     Defendant CRC owes fiduciary duties to CP and IHB as the majority shareholder of IHB.

148.     The Majority Directors owe fiduciary duties to CP and IHB as directors of IHB.

149.     The Parent Entities owe fiduciary duties to CP and IHB because they jointly own and exercise control over CRC.

150.     Defendant CRC, the Majority Directors, and the Parent Entities have breached their fiduciary duties to CP and IHB by failing to act with utmost good faith and loyalty; by failing to act toward CP and IHB in an honest, fair, and reasonable manner; by committing corporate waste and oppression; by defeating CP's reasonable expectations of a voice in, and participation in, the operation and management of IHB; and by engaging in self-dealing at the expense of IHB's and CP's interests.

151.     Specifically, through coercing IHB management's acceptance of the Revised Master Trackage Rights Agreement, Defendants CRC, the Majority Directors, and the Parent Entities compelled IHB to depart from a more than 100-year course of dealing between CRC and IHB and pay grossly excessive rental rates that could lead to the financial insolvency of IHB.

152.     Despite their obligations to act in IHB's and CP's best interest, Defendants CRC,

CORE/2049518.0202/133393866.6

the Majority Directors, and the Parent Entities actively negotiated against IHB's interests by demanding that IHB pay rental rates significantly greater than those set forth in the IHB Management Recommendation, placing their own interests above the interests of IHB and its shareholders.

153.    The Revised Master Trackage Rights Agreement includes rental rates that grossly exceed market standards, and are grossly in excess of those approved by IHB management in the IHB Management Recommendation.

154.    These grossly excessive and onerous rates pose a serious threat to IHB's continued financial solvency.

155.    Defendants CRC, the Majority Directors, and the Parent Entities have failed to fulfill their fiduciary duties to ensure that the transaction was reasonable and not excessive.

156.    By breaching their fiduciary duties, Defendants CRC, the Majority Directors, and the Parent Entities have wasted corporate assets that should have been preserved as operating capital in a down economy, or which otherwise would be available for distributions to IHB's shareholders.

157.    Defendants CRC, the Majority Directors, and the Parent Entities have also committed corporate waste and breached their fiduciary duties by demanding that IHB pay excessive amounts of back rent that they claim IHB owes for operating over their property since 1999, even though they are aware that they have no basis in law or fact to demand payment of these amounts.

158.    Defendants CRC, the Majority Directors, and the Parent Entities have also breached their fiduciary duties to CP by defeating its reasonable expectations of a voice in, and participation in, the operation and management of IHB.

21

159.     Specifically, despite the fact that the IHB Board unanimously passed the IHB Board Resolution, directing IHB's shareholders to implement the IHB Management Recommendation, the Defendant Landlords—acting as agents of the Parent Entities—engaged in closed-door negotiations in contravention of the IHB Board Resolution.

160.     The result of those negotiations was approved by the Majority Directors, acting as agents for CRC and the Parent Entities.

161.     Plaintiff CP, as a minority shareholder, had the right to participate in these negotiations with IHB management, but was prevented from doing so by Defendants CRC, the Majority Directors, and the Landlords.

162.     By including higher rental rates in direct contravention of the IHB Management Recommendation, the Revised Master Trackage Rights Agreement constitutes a self-interested transaction because Defendants CRC, the Majority Directors, and the Parent Entities are acting to benefit the Landlords, Parent Entities, and Holding Entities at the expense of IHB's shareholders.

163.     IHB obtained a better bargain, as indicated in the IHB Management Recommendation and IHB Board Resolution.

164.     Despite the approved IHB Board Resolution, Defendants CRC, the Majority Directors, and the Parent Entities diverted for their own purposes the corporate gain that IHB could have realized through the IHB Management Recommendation, and they failed to provide full disclosures to IHB, CP, or IHB's Minority Directors.

165.     By virtue of Defendants CRC's, the Majority Directors', and the Parent Entities' breaches of their fiduciary duties as set forth herein, CP suffered damages and is entitled to any and all equitable and legal remedies that this Court may deem just and proper, including, without

limitation, the return to IHB of all rental payments made to and profits earned by the Landlords under the Revised Master Trackage Rights Agreement, damages in an amount to be determined at trial, a declaration that the Revised Master Trackage Rights Agreement is void, an injunction compelling the Landlords to implement and enforce the IHB Board Resolution, an award to IHB of all O&M Expenses that Conrail was obligated to pay pursuant to the terms of the 1906 Agreement, payment of CP's applicable expenses and attorney's fees incurred herein, and such further relief as the Court deems just and proper.

166.    Furthermore, CP is entitled to an award of punitive damages in an amount to be determined at trial, on the basis that CRC's, the Majority Directors', and the Parent Entities' breaches of their fiduciary duties were wanton, willful, intentionally oppressive, and/or malicious.

**COUNT II**
**Aiding and Abetting Breach of Fiduciary Duties**
**(Against the Parent Entities, NSR, CSXT, and the Holding Entities)**

167.    CP re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

168.    The Parent Entities owe fiduciary duties to IHB and its shareholders because they are indirect owners of and exercise control over CRC, and because they exercise control over IHB by virtue of CRC's majority interest in IHB and the 1999 Agreement.

169.    Alternatively, if the Parent Entities do not owe fiduciary duties to IHB and its shareholders, they are liable as aiders and abettors of CRC's and the Majority Directors' breaches of fiduciary duties as set forth in this First Amended Complaint.

170.    Likewise, Defendants NSR, CSXT, and the Holding Entities are liable as aiders and abettors of CRC's and the Majority Directors' breaches of fiduciary duties as set forth in this

First Amended Complaint.

171.    Specifically, as set forth in the preceding paragraphs, Defendants CRC (as the majority shareholder) and the Majority Directors (as directors of IHB) owed IHB and Plaintiff CP fiduciary duties.

172.    CRC and the Majority Directors breached their fiduciary duties to IHB and CP as set forth in the preceding paragraphs.

173.    The Parent Entities, NSR, CSXT, and the Holding Entities—acting by and through their agents—knowingly and substantially assisted CRC and the Majority Directors, individually and collectively, in the breach of their fiduciary duties by taking the actions alleged in the preceding paragraphs.

174.    The Parent Entities, NSR, CSXT, and the Holding Entities—acting by and through their agents—were aware of their role when assisting in CRC's and the Majority Directors' breaches of fiduciary duties, and knowingly and intentionally joined CRC and the Majority Directors in their breaches of those duties.

175.    Through the assistance of the Parent Entities, NSR, CSXT, and the Holding Entities in CRC's and the Majority Directors' breaches of fiduciary duties, CP suffered damages and is entitled to any and all equitable and legal remedies that this Court may deem just and proper, including, without limitation, the return to IHB of all rental payments made to and profits earned by the Landlords under the Revised Master Trackage Rights Agreement, damages in an amount to be determined at trial, a declaration that the Revised Master Trackage Rights Agreement is void, an injunction compelling the Landlords to implement and enforce the IHB Board Resolution, an award to IHB of all O&M Expenses that Conrail was obligated to pay pursuant to the terms of the 1906 Agreement, payment of CP's applicable expenses and

CORE/2049518.0202/133393866.6

attorney's fees incurred herein, and such further relief as the Court deems just and proper.

176.   Furthermore, CP is entitled to an award of punitive damages in an amount to be determined at trial, on the basis that the Parent Entities', NSR's, CSXT's, and the Holding Entities' conduct in assisting these breaches of fiduciary duties was wanton, willful, intentionally oppressive, and/or malicious.

**COUNT III**
**Civil Conspiracy to Breach Fiduciary Duties**
**(Against All Defendants, Excluding IHB)**

177.   CP re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

178.   Defendants (excluding IHB) acting in concert with one another, conspired and agreed to cause CRC, the Parent Entities, and the Majority Directors to breach their fiduciary duties toward CP and IHB, as set forth in greater detail above.

179.   Defendants (excluding IHB) each made overt acts in furtherance of the conspiracy, as set forth in greater detail above.

180.   As a result, Defendants (excluding IHB) obtained the power to accomplish the unlawful purpose which they could not accomplish individually.

181.   As a direct and proximate result of the actions taken in furtherance of this conspiracy, CP suffered damages and is entitled to any and all equitable and legal remedies that this Court may deem just and proper, including, without limitation, the return to IHB of all rental payments made to and profits earned by the Landlords under the Revised Master Trackage Rights Agreement, damages in an amount to be determined at trial, a declaration that the Revised Master Trackage Rights Agreement is void, an injunction compelling the Landlords to implement and enforce the IHB Board Resolution, an award to IHB of all O&M Expenses that

Conrail was obligated to pay pursuant to the terms of the 1906 Agreement, payment of CP's applicable expenses and attorney's fees incurred herein, and such further relief as the Court deems just and proper.

182.    CP is entitled to an award of punitive damages in an amount to be determined at trial, on the basis that Defendants'—excluding IHB—conduct in assisting these breaches of fiduciary duties was wanton, willful, intentionally oppressive, and/or malicious.

**COUNT IV**
**Vicarious Liability for Breach of Fiduciary Duties**
**(Against the Landlords, Parent Entities, and the Holding Entities)**

183.    CP re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

184.    CRC and the Majority Directors owe fiduciary duties to CP and IHB, as set forth in the preceding paragraphs.

185.    CRC and the Majority Directors breached their fiduciary duties to IHB and CP, as set forth in the preceding paragraphs.

186.    CSX, NS, and the Holding Entities are vicariously liable for the breaches of fiduciary duties committed by CRC and the Majority Directors.

187.    Specifically, CSX, NS, and the Holding Entities are vicariously liable for CRC's breaches of fiduciary duties by virtue of, *inter alia*, the following:

a.    CSX and NS, through the Holding Entities, are 100% owners of CRC;

b.    Pursuant to the 1999 Agreement, CSX and NS possess an equal right to direct the exercise of CRC's ownership rights regarding IHB and to select a majority and equal number of IHB directors to be appointed by CRC;

c.    Pursuant to the 1999 Agreement, the Majority Directors appointed by CSX

26

and NS vote as a bloc on matters relating to the IHB; and

d.   CSX, NS, and the Holding Entities, as parent entities to CRC, have a financial interest in the rental payments from IHB to CRC.

188.   Therefore, CSX, NS, and the Holding Entities knew of and directly benefitted from CRC's breaches of fiduciary duties.  Furthermore, CSX, NS, and the Holding Entities possessed the right and ability to supervise CRC regarding the actions taken by CRC, CSX, and NS with respect to the IHB and, more specifically, the actions set forth in the preceding paragraphs.

189.   In addition, the Landlords, Parent Entities, and Holding Entities are vicariously liable for the Majority Directors' breaches of fiduciary duties by virtue of, *inter alia*, the following:

a.   The Majority Directors are officers of CSX and NS;

b.   As the CSX and NS appointed directors of the IHB Board, the Majority Directors acted for the benefit and on behalf of the Landlords, the Parent Entities, and the Holding Entities in taking the actions alleged herein;

c.   At all relevant times and in all actions alleged herein, the Majority Directors were acting within the scope of agency delegated by the Landlords, the Parent Entities, and the Holding Entities;

d.   At all relevant times and in all relevant actions alleged herein, the Majority Directors were subject to the control of the Landlords, the Parent Entities, and the Holding Entities.

190.   Therefore, the Landlords, Parent Entities, and Holding Entities knew of and directly benefitted from the Majority Directors' breaches of fiduciary duties.  Furthermore, the

CORE/2049518.0202/133393866.6

Landlords, Parent Entities, and Holding Entities possessed the right and ability to supervise the Majority Directors regarding the actions taken by the Majority Directors with respect to the IHB and, more specifically, the actions set forth in the preceding paragraphs.

191.    As a direct and proximate result of the breaches of fiduciary duties by CRC and the Majority Directors, CP suffered damages and is entitled to any and all equitable and legal remedies that this Court may deem just and proper, including, without limitation, the return to IHB of all rental payments made to and profits earned by the Landlords under the Revised Master Trackage Rights Agreement, damages in an amount to be determined at trial, a declaration that the Revised Master Trackage Rights Agreement is void, an injunction compelling the Landlords to implement and enforce the IHB Board Resolution, an award to IHB of all O&M Expenses that Conrail was obligated to pay pursuant to the terms of the 1906 Agreement, payment of CP's applicable expenses and attorney's fees incurred herein, and such further relief as the Court deems just and proper.

192.    CP is entitled to an award of punitive damages in an amount to be determined at trial, on the basis that CRC's and the Majority Directors' breaches of fiduciary duties were wanton, willful, intentionally oppressive, and/or malicious.

## CP'S DIRECT CLAIMS UNDER INDIANA LAW

193.    CP's claims asserted in this action are direct claims because the harm caused by the Defendants—excluding IHB—is suffered uniquely by CP.

194.    Among other things, if the misconduct by Defendants—excluding IHB—is allowed to stand, CP would be deprived of any distributions or dividends that would otherwise be available for the benefit of all of IHB's shareholders.

195.    This misconduct has the practical effect of appropriating all distributions and

CORE/2049518.0202/133393866.6

dividends to Landlords (and indirectly to the Parent Entities and Holding Entities), causing unique and individual harm to CP.

196.    Alternatively, because IHB is an Indiana closely held corporation, the Court, in its discretion, may treat an action raising derivative claims as a direct action.

197.    To the extent the Court were to view CP's claims herein as derivative, the court should exercise its discretion to treat the action as direct for the following reasons:

(a)     IHB is a closely held corporation with only two shareholders, and allowing this action to proceed as a direct action would not expose IHB to a multiplicity of suits;

(b)     A direct action would not prejudice IHB's creditors—to the contrary, the relief sought by CP herein would protect IHB's financial position and ability to pay its creditors; and

(c)     A direct action would not interfere with a fair distribution of funds because CP is the party who would ultimately be harmed if the exorbitant and unfair rental rates being forced upon IHB by its majority shareholder, affiliated entities, and captive Majority Directors are allowed to stand.

## DEMAND REQUIREMENT IS OTHERWISE EXCUSED AS FUTILE

198.    To the extent that the claims asserted and relief sought by CP as the minority shareholder in IHB are derivative in nature, a demand should be excused as futile because a majority of the IHB Board is comprised of interested directors, there is a substantial likelihood that those interested directors will be held personally liable, and IHB's majority shareholder is implicated in this dispute.

199.    In addition, CP has made repeated requests to the Majority Directors, Landlords, and Parent Entities to take actions consistent with the relief requested herein, and those requests

CORE/2049518.0202/133393866.6

have been ignored.

200. By bringing this action without first making a formal demand, CP will not unfairly expose IHB or the other named Defendants to multiple actions, materially prejudice the interests of IHB's creditors, or interfere with a fair distribution of the recovery among all interested persons. In particular, Conrail's actions—taken through NS and CSX—will cause injury to only one shareholder, CP, and will not injure the only remaining shareholder, CRC.

**WHEREFORE**, CP prays that the Court enter judgment in its favor, and against Defendants, as follows:

1. Finding that the Majority Directors, CRC, and the Parent Entities have breached their fiduciary duties as shareholders and directors, and awarding damages for said breaches of fiduciary duties in an amount to be determined at trial;

2. Finding that the Parent Entities, NSR, CSXT, and the Holding Entities aided and abetted the breach of fiduciary duties committed by the Majority Directors, CRC, and the Parent Entities;

3. Finding that all Defendants—excluding IHB—engaged in a civil conspiracy to cause CRC, the Parent Entities, and the Majority Directors to breach their fiduciary duties;

4. Finding NS, CSX, CRC, and the Holding Entities vicariously liable for the breaches of fiduciary duties by CRC and the Majority Directors;

5. Awarding CP punitive damages, in an amount to be determined at trial, on the basis that these breaches of fiduciary duties were wanton, willful, intentionally oppressive, and/or malicious;

6. Awarding IHB the O&M Expenses that Conrail was obligated to pay pursuant to the terms of the 1906 Agreement;

30

7.      Ordering the Landlords, Parent Entities, and Holding Entities to disgorge any ill-gotten profits resulting from IHB's payments under the Revised Master Trackage Rights Agreement;

8.      Voiding the Revised Master Trackage Rights Agreement;

9.      Entering an injunction compelling Defendants to implement and enforce the IHB Board Resolution;

10.     Awarding CP its costs and reasonable attorneys' fees incurred herein; and

11.     Awarding any other relief that the Court deems just and equitable.

## JURY TRIAL DEMANDED

CP demands a trial by jury of all issues so triable.

**EICHHORN & EICHHORN, LLP**

Dated: June 13, 2017           By: /s/ David C. Jensen
                                   David C. Jensen, #4893-45
                                   200 Russell Street, P.O. Box 632
                                   Hammond, IN  46325
                                   (291) 931-0560
                                   Fax: (291) 931-5370
                                   Email: djensen@eichhorn-law.com

**STINSON LEONARD STREET LLP**

Dated: June 13, 2017           By: /s/ Douglas R. Dalgleish
                                   Douglas R. Dalgleish *(Pro Hac Vice)*
                                   Stinson Leonard Street LLP
                                   1201 Walnut Street, Suite 2900
                                   Kansas City, MO 64106
                                   (816) 842-8600
                                   Fax: (816) 691-3495
                                   Email: doug.dalgleish@stinson.com

                                   Bryant D. Tchida *(Pro Hac Vice)*
                                   Thomas C. Burman *(Pro Hac Vice)*
                                   Stinson Leonard Street LLP
                                   150 South Fifth Street, Suite 2300

31

Minneapolis, MN  55402
(612) 335-1500
Fax: (612) 335-1657
Email: bryant.tchida@stinson.com
Email: thomas.burman@stinson.com

*Attorneys for Soo Line Railroad*
*Company d/b/a Canadian Pacific*

CORE/2049518.0202/133393866.6

## **VERIFICATION**

CITY OF CALGARY )
)
PROVINCE OF ALBERTA ) ss
)
CANADA )

I, James Clements, being first duly sworn, depose and state that I am a duly authorized agent of the corporate plaintiff bringing the foregoing First Amended Complaint, that I have read the First Amended Complaint, and that the facts therein are true to my knowledge, except as to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

JAMES CLEMENTS

Subscribed and sworn to before me
this 13 day of June, 2017.

Notary Public in and for the Province of Alberta

CRAIG J. FAHLMAN
Barrister & Solicitor